**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-04-676 |
| | § | C.A. No. C-07-193 |
| BRIAN MCCUISTON, | § | |
| | § | |
| Defendant/Movant. | § | |

**ORDER DENYING MOTION TO VACATE,**
**SET ASIDE OR CORRECT SENTENCE, AND**
**ORDER DENYING CERTIFICATE OF APPEALABILITY**

Pending before the Court is Brian McCuiston's ("McCuiston") motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (D.E. 126),[1] which was received by the Clerk on April 23, 2007.  He also filed a supplemental memorandum supporting one of his claims on June 5, 2007. (D.E. 133.)  The government filed its response on July 20, 2007, in which it argues that McCuiston's motion should be denied.  (D.E. 131.)  On August 24, 2007, McCuiston filed a reply (D.E. 132), which the Court has also considered.  For the reasons set forth below, McCuiston's § 2255 motion is DENIED.   Additionally, the Court DENIES McCuiston a Certificate of Appealability.

**I. JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2255.

---

[1] Dockets entries refer to the criminal case, C-04-cr-676.

## II. FACTS AND PROCEEDINGS

**A.      Summary of Offense[2]**

In the late 1990s, federal law enforcement authorities began investigating cocaine, marihuana and methamphetamine distribution in the Corpus Christi, Texas area which was being conducted by members and associates of a local street gang, the Corrupt Criminal Mob ("CC Mob"). The gang was started around 1993 and McCuiston was an identified mob member. McCuiston, along with his co-defendants Robert Mott and Richard Daniel, and with Frank Tijerina,[3] were at the top of the hierarchy and all split the profits from the drug distribution.

One confidential informant ("CI1") reported transporting methamphetamine for the mob from 1997 through 2003, moving bundles taped to his/her body from California to Corpus Christi. Another confidential informant reported ("CI7") that after his/her release from prison in 1997, he began receiving methamphetamine from McCuiston for $8,000-$8,500 per pound. CI7 sold 1 kilogram of methamphetamine per month until being arrested in January 2003. After CI7's arrest, McCuiston provided money to CI7 for an attorney. CI7 was also told by McCuiston that he wanted to set up a methamphetamine distribution ring in Kansas with the help of McCuiston's brother, Eric.   In July 1998, McCuiston was present at an apartment where methamphetamine was being distributed. He and Daniel entered and left the apartment under surveillance. After a high speed chase, Daniel jumped from the vehicle and fled on foot. Police back-tracked his route and found a bundle of methamphetamine, which weighed approximately 415 grams. A search of the apartment where Daniel

---

[2]  The fact of the offense are taken from McCuiston's Presentence Investigation Report ("PSR") at paragraphs 5-29. There are far more details involved than listed here, but McCuiston's direct involvement is highlighted herein.

[3]  Tijerina was indicated in a separate criminal case.

2

and McCuiston had picked up the methamphetamine revealed another bundle wrapped exactly like the one recovered, as well as a second bundle.  The total amount of methamphetamine seized from the apartment weighed approximately 1 kilogram.

CI2 advised that he/she delivered methamphetamine locally for the CCMob, and also described the methods used for distribution from 1999 through 2003.  CI2 reported that McCuiston and others sent runners to California to retrieve the methamphetamine and that CI2 believed McCuiston was laundering the drug money through his business, Half-price Glass.

A cooperating co-defendant ("CD1") advised that around April 2003, he/she was introduced to McCuiston and began receiving methamphetamine from Tijerina on behalf of McCuiston.  CD1 received between 4 and 8 ounces of methamphetamine twice per month, and the purchases were negotiated through McCuiston at his business, Half-Price Glass.  After CD1 established customers, he/she began receiving 1-2 pounds of methamphetamine for $12,500 pound from McCuiston, except for the months of April, May and June 2004, when the supply had dried up.  CD1 estimated that he/she received 7-9 kilograms of methamphetamine from the organization through McCuiston.  CD1 identified McCuiston as the top individual in the drug distribution organization and also personally received methamphetamine from McCuiston and Daniel.

A different cooperating co-defendant ("CD2") told agents that he/she purchased 1.5 ounces of methamphetamine each month from Cory, but that the methamphetamine was coming from California and was controlled by Tijerina and McCuiston.

A third cooperating co-defendant ("CD3") told agents that he met Tijerina and McCuiston in 2002.  CD3 was aware that the organization (led by Tijerina, Mott, McCuiston and Daniel) was transporting 7-11 kilograms of methamphetamine each month.  When the organization ran into supply

difficulties in February 2004, CD3 used his/her contacts in Dallas to secure approximately 1.5 kilograms of methamphetamine for the organization.

Several other cooperating co-defendants and confidential sources identified McCuiston, Tijerina, Mott and Daniel as the four persons in charge of the methamphetamine distribution ring. They also testified regarding specific amounts that were involved.  Utilizing information from all the confidential informants, cooperating sources and cooperating co-defendants, the PSR held McCuiston accountable for at least 151.915 kilograms of methamphetamine.

**B.      Criminal Proceedings**

On November 23, 2004, McCuiston was charged with Mott and Daniel in a single-count indictment with knowingly and intentionally conpiring to possess with intent to distribute more than 500 grams of a mixture of substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (D.E. 1.)  McCuiston proceeded to trial on March 7 and 8, 2005, and the jury returned a guilty verdict on March 8, 2005. (D.E. 61-72.)

The Court ordered the U.S. Probation Office to prepare a Presentence Investigation Report ("PSR") and sentencing occurred on June 6, 2005. (D.E. 72, 96.)  The Court  sentenced McCuiston to 280 months in the custody of the Bureau of Prisons, to be followed by a five-year supervised release term, and also imposed a $100 fine and $100 special assessment. (D.E. 96, 99.)  Judgment was entered on June 6, 2005.  (D.E. 99).  McCuiston timely appealed, and the Fifth Circuit affirmed in a per curiam opinion issued June 28, 2006. (D.E. 121.)  McCuiston filed a petition for writ of certiorari, which the Supreme Court denied on November 9, 2006. (D.E. 125.) McCuiston v. United States, 127 S. Ct. 536 (2006).  McCuiston's § 2255 motion was received by the Clerk on April 23, 2007. (D.E. 126.)  It is timely.

4

### III.  MOVANT'S ALLEGATIONS

McCuiston's motion and supplemental motion list five grounds for relief.  First, he argues that the indictment in his case was defective because it stated that the charged crime occurred "in the Corpus Christi division of the Southern District of Texas and elsewhere within the jurisdiction of the Court," but it did not charge that crimes occurred elsewhere.  He claims the indictment is defective because the proof at trial showed that the conspiracy and drugs for which he was sentenced occurred elsewhere, as well as in Corpus Christi. (D.E. 126 at 4-8.)

Second, he claims that the Court erred in admitting into evidence his prior juvenile record because it was not certified by the Attorney General.

Third, he claims that he was denied effective assistance of counsel because counsel failed to suppress the use of his prior juvenile record prior to and during trial.  (D.E. 126 at 4.)

Fourth, in his supplement which appears to contain boilerplate language cobbled together from other sources, McCuiston argues that this Court did not have jurisdiction to indict and convict him because 18 U.S.C. § 3231 (which gives the federal courts original jurisdiction over all federal crimes) is not a validly enacted law.  He argues that the statute is unconstitutional because Public Law 80-772, which codified Title 18 of the United States Code, was not validly enacted.

In support of his fourth claim, he points to the legislative history of Public Law 80-772, which he claims was never correctly passed by both houses of Congress in the same session Congress, and thus is an invalid law.  (See generally D.E. 133.)  Specifically, he claims: (1) that the House version of the bill died due to two sine die adjournments, and that the amended 1948 bill was read only once in the Senate and was thus not enacted properly  (D.E. 133 at 13-18); and  (2) that the Senate version of the bill was a different bill textually than the one signed by the Speaker of the House, the President pro tempore of the Senate, and President Truman and that the signatories knew "the enacting clause

5

was false." (D.E. 133 at 18.)  Accordingly, he argues that this Court's actions were "*ultra vires*" and void and that he is being illegally held in custody.  (D.E. 133 at 1, 9-13.)

In his supplement, McCuiston also argues that his counsel was constitutionally ineffective because he failed to challenge the district court's jurisdiction based on the defects in the enactment of 18 U.S.C. § 3231.  The Court treats this as his fifth ground for relief.

For the reasons set forth herein, all of McCuiston's claims fail.

## IV.  DISCUSSION

### A.   28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues; (2) challenges to the district court's jurisdiction to impose the sentence; (3) challenges to the length of a sentence in excess of the statutory maximum; and (4) claims that the sentence is otherwise subject to collateral attack.  28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).

### B.   Procedural Default

The government argues that McCuiston's claims, with the exception of his ineffective assistance claims, are barred because he failed to raise them on direct appeal.  (D.E. 131 at 3-7.)  Where a defendant fails to raise an issue in his criminal proceedings, that issue is procedurally barred from consideration in § 2255 proceedings.  See United States v. Lopez, 248 F.3d 427, 433 (5th Cir. 2001); United States v. Kallestad, 236 F.3d 225, 227 (5th Cir. 2000).  A district court may consider

a defaulted claim only if the petitioner can demonstrate either (1) cause for his default and actual prejudice; or (2) that he is actually innocent of the crime charged. <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998); <u>United States v. Jones</u>, 172 F.3d 381, 384 (5th Cir. 1999).

McCuiston's claim challenging the indictment on the grounds that it did not specify a geographic location where the crime occurred, and his claim that the Court lacked jurisdiction due to improprieties in the passage of Public Law 80-772, are procedurally barred because McCuiston did not raise them on appeal.  Additionally, he has failed to demonstrate either "cause and prejudice" or "actual innocence" in order to overcome the procedural bar.  As discussed herein, moreover, even if they were properly before the Court, they fail on their merits.

McCuiston's claims of ineffective assistance of counsel are  properly made for the first time in a § 2255 motion because they raise an issue of constitutional magnitude and generally cannot be raised on direct appeal.  <u>United States v. Bass</u>, 310 F.3d 321, 325 (5th Cir. 2002); <u>United States v. Pierce</u>, 959 F.2d 1297, 1301 (5th Cir. 1992).   Thus, the Court addresses the merits of McCuiston's ineffective assistance claims.

**C.     Claim That Indictment Was Defective for Lack of Specific Geographical Location**

McCuiston's first claim is that the indictment in his case was defective because it did not contain references to the numerous other places where acts in furtherance of the conspiracy occurred. In particular, he argues that the proof from witnesses at trial showed that the conspiracy "extended as far as California" and that different groups of people would travel to different places in California to purchase methamphetamine and bring it back to Corpus Christi for resale.  He also claims that he and his co-defendants lived in Oregon, in Kansas and in Oklahoma for a portion of the time at issue.

Because the indictment "does not include the geographical points" in the other states, he argues, the indictment is defective.  (D.E. 125 at 5.)

As previously noted, McCuiston is procedurally barred from raising this claim here. Moreover, even if it were properly before the Court, the claim is without merit.  An indictment is sufficient if it: (1) contains the elements of the offense charged; (2) fairly informs a defendant of the charge against him; and (3) enables him to plead acquittal or conviction in bar of future prosecutions for the same offense.  United States v. Hagmann, 950 F.2d 175 (5th Cir. 1991) (internal citations omitted).  An indictment's validity depends not on "whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards."  United States v. Webb, 747 F.2d 278, 284 (5th Cir. 1984) (citation omitted).  In this case, the indictment satisfies the three requirements set forth in Hagmann, and McCuiston does not argue to the contrary. Instead, he complains that there mere absence of the mention of other locations where the conspiracy occurred renders the indictment defective.  He is incorrect.

The indictment here charged a conspiracy that occurred in Corpus Christi and elsewhere in the Southern District of Texas.  (D.E. 1).  It is true that the proof at trial included acts in furtherance of the conspiracy *both* within the Southern District of Texas and in other states.  (D.E. 121) (Fifth Circuit's opinion in this case setting forth the basic facts of the conspiracy).  McCuiston's claim that the lack of reference in the indictment to these other locations somehow destroys the Court's jurisdiction, however, is without legal basis.[4]

---

[4]  Notably, although McCusiton cites to a number of cases on this claim, none of them held that the failure to list in the indictment all of the locations where conspiratorial acts took place rendered an indictment defective.  He cites to numerous cases for the proposition that the failure to charge an "essential element of a crime" fails to charge the offense, but the essential elements of the conspiracy here were charged.  The fact that not every factual "element" of the conspiracy was charged in the indictment (as opposed to an element of the offense under the law) is irrelevant.

8

The Fifth Circuit has held that "[i]t is not necessary to prove the exact location of the offense alleged in the indictment, provided it is proven to be within the jurisdiction of the court." Norris v. United States, 152 F.2d 808, 811 (5th Cir. 1946); see also Cagnina v. United States, 223 F.2d 149, 153 n.2 (5th Cir. 1955) (citing Norris for the proposition that even where there is a variance as to the location alleged in an information and the proof at trial, the variance is "immaterial so long as there is no misleading and so long as the proof shows the offense occurred within the jurisdiction of the court").

In this case, there can be no doubt that the government proved the offense to have occurred within the jurisdiction of the Court. Indeed, the Fifth Circuit has held that a district court has jurisdiction over a conspiracy case where **_some_** of the overt acts were committed in furtherance of the conspiracy within the jurisdiction of the Court. See Rivard v. United States, 375 F.2d 882, 886-87 (5th Cir. 1967) (in international case, district court had jurisdiction to try an alien for conspiracy, formed outside of the United States, because several of the overt act in furtherance of the conspiracy were committed by a co-conspirator within the United States); cf. 18 U.S.C. § 3237(a) ("any offense against the United States begun in one district and committed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed").

Based on the foregoing authority, the lack of reference in the indictment to every location where acts occurred in furtherance of the conspiracy does not render the indictment defective. McCuiston's first claim challenging the indictment therefore fails.

**D.**     **Claim that the Court Erred in Admitting His Juvenile Record**

McCuiston's second claim, i.e., that the Court erred in admitting his juvenile record, fails because it was addressed and rejected by the Fifth Circuit in McCuiston's direct appeal. (See D.E.121 at 2-3.)  Indeed, it has long been "settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 Motions." United States v. Kalish, 780 F.2d 506, 508 (5th Cir. 1986) (affirming district court's refusal to entertain the defendant's § 2255 motion).  Accordingly, this claim, too, fails.

**E.**     **Arguments Challenging the Validity of Public Laws 80-772**

Even if it were properly before the Court, McCuiston's claim regarding the invalidity of 18 U.S.C. § 3231 is without merit. As noted, McCuiston claims that the statute used to indict and convict him was not validly enacted and thus that the Court had no jurisdiction over his criminal case. Specifically, McCuiston claims that the bill that eventually became Public Law No. 80-772 never passed both houses of Congress in the same version.  He contends that the bills were acted upon by the House, but not the Senate, before Congress adjourned and that the House version of the bill died at adjournment.

In support of his claim, McCuiston attaches a large number of documents purportedly supporting his factual recitation of the facts.  He also relies heavily on Kennedy v. Sampson, 511 F.2d 430 (D.C. Cir. 1974) and, in particular, on the text of two footnotes in the appendix to that opinion.[5] (See D.E. 133 at 14-17 & nn. 8-9.)  The text of one of those footnotes describes the adjournment in

_____

[5] The issues and holding in Kennedy are irrelevant to McCuiston's motion, and he does not rely upon any holdings in the case.  Thus, the Court does not address them, nor the later authority calling those holdings into doubt.

July 1947 (after the House passed the bill that would become Public Laws 80-772, but before the Senate did) as follows:

> The Senate and the House of Representatives adjourned on July 27, 1947 under a "conditional final adjournment" resolution, S. Con. Res. 33; 93 Cong. Rec. 10400. Pursuant to the resolution, the two Houses were to stand in adjournment until January 2, 1948, unless recalled into a session earlier by specified Senate and House leaders. In effect, the adjournment was a sine die adjournment, not an intrasession adjournment.

Kennedy, 511 F.3d 430, Appx. at n.4. When Congress adjourns sine die, unpassed bills die of their own accord.[6] Thus, the footnotes in Kennedy appear to lend some credence to McCuiston's arguments.

But those footnotes must also be read in context. It is clear from the context that the intended meaning of those words was that the July 1947 recess was not an *intrasession* recess (which was what the rest of the Appendix referred to), but an *inter*session recess. That is, although the term "sine die" is used in the footnotes, it was intended to convey that a session of Congress was ending, rather than merely having a break in the session. It should not be read as McCuiston reads it, to mean that the entirety of the Congress (i.e., both sessions of Congress) ended at the time. Instead, only one of the two sessions of Congress ended. The text where the footnotes occur make this clear, too, because it indicates that footnotes 4 and 5 refer to the 1st session of the 80th Congress, and the 2nd session of the 80th Congress, respectively. Taken in context, those footnotes cannot be read literally to mean that there was an adjournment sine die of that entire Congress, such that all pending bills died. Moreover, the 80th Congress did not adjourn sine die in July 1947. When the first session adjourned, it did so

---

[6] The term "adjournment sine die" is defined as "[t]he ending of a deliberative assembly's or court's session without setting a time to reconvene." Black's Law Dictionary 44 (8th ed. 2004).

to a date certain, not sine die.  See Kennedy, 511 F.2d 430, Appx. at n. 4 (Congress adjourned in July 1947 until January 2, 1948). Accordingly, the Court finds no merit in McCuiston's contentions.

The Court further notes that numerous other district courts have rejected the same or similar argument raised by § 2255 movants, including two district judges of the Southern District of Texas. See United States v. Martinez, Cr. No. C-04-157, 2006 WL 1293261 (S.D. Tex. May 6, 2006) (Chief Judge Head determining that the same argument is invalid and erroneous); Delreth v. United States, Cr. No. L-03-1745-6, 2006 WL 1804618, at *4 (S.D. Tex. June 27, 2006) (United States District Judge Kazen stating that "[p]etitioner's analysis does not persuade the Court that there is any material flaw in the jurisdictional statute, and additional factors militate strongly against him" and further noting that, "even if 18 U.S.C. § 3231 was flawed, legislation that pre-dated section § 3231 would have operated to give the Court jurisdiction over federal crimes"); see also United States v. Felipe, 2007 WL 1740263 (E.D. Pa June 14, 2007) (collecting authority and concluding that "this mythical story concerning the irregular adoption of Public Law Number 80-772 is utterly baseless").

Additionally, the Court finds persuasive the government's argument in its response that the "enrolled bill rule" requires rejection of McCuiston's claim.  In short, that rule provides that an attested "enrolled bill" – one signed by the leaders of the House and Senate – establishes that Congress passed the text included therein in a constitutional manner and it "should be deemed complete and unimpeachable."  Public Citizen  v. United States District Court for the District of Columbia, 486 F.3d 1342, 1343 (D.C. Cir. 2007) (quoting Marshall Field & Co. v. Clark, 143 U.S. 649, 672-73 (1892)).

In Public Citizen, the District of Columbia Circuit Court of Appeals held that a district court had properly dismissed a constitutional challenge to the Deficit Reduction Act of 2005 premised on

the ground that the statute was invalid because the bill that was presented to the President did not pass both chambers of Congress in the exact same form. 486 F.3d at 1343-45. The Court explained the rule, based on <u>Marshall Field</u>, as follows:

> "It is not competent for [a party raising a bicameralism challenge] to show, from the journals of either house, from the reports of committees or from other documents printed by authority of Congress, that [an] enrolled bill" differs from that actually passed by Congress. [<u>Marshall Field</u>, 143 U.S.] at 680. The only "evidence upon which a court may act when the issue is made as to whether a bill . . . asserted to have become a law, was or was not passed by Congress" is an enrolled act attested to by declaration of "the two houses, through their presiding officers." <u>Id.</u> at 670, 672. An enrolled bill, "thus attested," "is conclusive evidence that it was passed by Congress." <u>Id.</u> at 672-73. "[T]he enrollment itself is the record, which is conclusive as to what the statute is ...." <u>Id.</u> at 675 (internal quotation marks omitted).

48 F.3d at 1350.

This rule mandates that this Court accept as conclusive Public Law. 80-772, and reject McCuiston's request that the Court look behind the bill at the Congressional actions taken on it while pending. Instead, the Court must treat the text in the enrolled bill as "complete and unimpeachable." <u>Public Citizen</u>, 486 F.3d at 1343 (quoting <u>Marshall Field</u>, 143 U.S. at 672-73). Notably, the Seventh Circuit Court of Appeals recently utilized the enrolled bill rule to reject a claim identical to the one raised by McCuiston. <u>See</u> <u>United States v. Miles</u>, 2007 WL 1958623, *1 (7th Cir. July 3, 2007) (citing <u>Marshall Field</u> and <u>Public Citizen</u>, <u>supra</u>).

In short, the "enrolled bill rule" makes it unnecessary to review his contentions concerning legislative irregularities, and, in any event, it appears that the law challenged by McCuiston was properly enacted into law. Moreover, as noted by Judge Kazen and other courts, <u>see</u>, <u>e.g.</u>, <u>United States v. Risquet</u>, 426 F. Supp. 2d 310, 311-312 (E.D. Pa .2006), even if the 1948 amendment to § 3231 were defective, this Court would nonetheless retain jurisdiction over McCuiston's case

13

because the predecessor statute to § 3231 also provides for such jurisdiction.  <u>Delreth</u>, <u>supra</u>, 2006 WL 1804618, at *4.

 For all of these reasons, McCuiston's challenge to 18 U.S.C. § 3231 fails.

**F. Ineffective Assistance of Counsel**

 **1. General Standards**

 McCuiston's ineffective assistance claims are properly analyzed under the two-prong analysis set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  <u>United States v. Willis</u>, 273 F.3d 592, 598 (5th Cir. 2001).  To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial.  <u>Id</u>.  This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. <u>U.S. v. Dovalina</u>, 262 F.3d 472, 474-75 (5th Cir. 2001).

 If the movant fails to prove one prong, it is not necessary to analyze the other.  <u>Armstead v. Scott</u>, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"), <u>cert. denied</u>, 514 U.S. 1071 (1995); <u>Carter v. Johnson</u>, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

 As discussed in the following sections, both of McCuiston's ineffective assistance claims fail because he cannot show prejudice.

 **2. Counsel's Failure to Challenge Admission of Juvenile Records**

 McCuiston claims that he was denied effective assistance of counsel because his trial counsel did not challenge the admission of his juvenile records.  As noted <u>supra</u> in Section IV.D., the Fifth

14

Circuit addressed the admission of these records and concluded that, if it was error at all, it was not plain error and did not affect his substantial rights. The Fifth Circuit's holding on this issue is dispositive of the prejudice prong of <u>Strickland</u> here. That is, McCuiston has not suffered any prejudice because he cannot show a reasonable probability that the result of his case would have been different, if his attorney had done something more to challenge the records. <u>See</u> <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."). This claim does not entitle McCuiston to relief.

### 3.      Counsel's Failure to Challenge the Validity of 18 U.S.C. § 3231

McCuiston's final claim of ineffective assistance fails for the same reason. That is, as discussed <u>supra</u> at Section IV.E., there is no merit in McCuiston's challenges to the jurisdiction of this Court. Thus, even is his counsel had raised such a challenge, the outcome of the proceeding would not have been different. <u>Kimler</u>, 167 F.3d at 893. Thus, he has failed to show prejudice and his ineffective assistance claim on this ground fails.

For the foregoing reasons, McCuiston's § 2255 motion is DENIED.

## G.      Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although McCuiston has not yet filed a notice of appeal, this Court nonetheless addresses whether he would be entitled to a COA. <u>See</u> <u>Alexander v. Johnson</u>, 211 F.3d 895, 898 (5th Cir. 2000) (a district court may *sua sponte* rule on a COA because "the district court that denies a

petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A COA "may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further. United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).

As to claims that the district court rejects solely on procedural grounds, the movant must show both that "jurists of reasons would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484 (emphasis added).

The Court concludes that reasonable jurists could not debate the denial of McCuiston's § 2255 motion on substantive grounds nor find that the issues presented are adequate to deserve encouragement to proceed. Miller-El, 537 U.S. at 327 (citing Slack, 529 U.S. at 484). Similarly, as to the claims that this Court has addressed on procedural grounds, the Court finds that McCuiston cannot establish at least one of the Slack criteria. Accordingly, McCuiston is not entitled to a COA.

16

## V.  CONCLUSION

For the above-stated reasons, McCuiston's motion under 28 U.S.C. § 2255 (D.E. 126) is

DISMISSED WITH PREJUDICE.  The Court also DENIES him a Certificate of Appealability.


ORDERED this 12th day of September, 2007.

Janis Graham Jack
United States District Judge